FILED
2012 Sep-18  PM 04:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **TOMMY JAMES GILLENTINE,** | ) | |
| **AIS #224967** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **5:11-CV-2694-RDP-TMP** |
| | ) | |
| **CORRECTIONAL MEDICAL** | ) | |
| **SERVICES, INC.; HUGH HOOD, M.D.;** | ) | |
| **BARRY BARRETT, M.D.; EARL C.** | ) | |
| **JOINER, M.D.; MANUEL** | ) | |
| **POUPARINAS, M.D.; DEBBIE HUNT, R.N.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Tommy James Gillentine, is an inmate in the Alabama penal system presently incarcerated at the Limestone Correctional Facility (LCF), in Harvest, Alabama, who filed this pro se action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that he has been deprived of rights, privileges, or immunities afforded him under the Constitution or laws of the United States of America and names as Defendants, Health Services Administrator Debbie Hunt, Dr. Hugh Hood, Dr. Barry Barrett, Dr. Earl Joiner, Dr. Manuel Pouparinas, and Correctional Medical Services, Inc.[1]  In particular, Plaintiff alleges that he has been denied

---

[1]  Correctional Medical Services, Inc., has changed its name to Corizon, and the court will refer to it as Corizon in this opinion.  Correctional Medical Services, now Corizon, has held the contract to supply medical services to prisoners in the Alabama Department of Corrections since November 1, 2007.  *See* Affidavit of Dr. Hugh Hood (Docs. 20-1 and 39-1).

adequate medical care for his chronic Hepatitis C during his incarceration.  As compensation for the alleged constitutional violations, Plaintiff seeks declaratory and injunctive relief, as well as damages.

## I.  **Procedural History**

At the same time he filed his § 1983 complaint, Plaintiff filed a Motion for Injunctive Relief (Seeking Emergency Medical Treatment). (Doc. 3).  In his motion, Plaintiff claimed that he was suffering liver failure because Defendants were refusing to provide him medical treatment for Hepatitis C, cirrhosis of the liver, and splenomegaly, due to the cost for the treatment.  Defendants were ordered to respond to Plaintiff's motion. (Doc. 7).  Dr. Hugh Hood, Associate Regional Medical Director for Corizon, the current prison medical care provider, submitted an affidavit in which he explained Plaintiff's medical diagnosis and the treatment he is currently receiving. (Doc. 8-1)  Plaintiff's motion for injunctive relief was denied on October 25, 2011. (Doc. 9)

On November 8, 2011, the court entered an Order for Special Report directing that copies of the complaint in this action be forwarded to each of the named Defendants and requesting that they file a special report addressing the factual allegations of Plaintiff's complaint.  Defendants were advised that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, would be considered as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  By the same Order, Plaintiff was advised that after he received a copy of the special report submitted

by Defendants he should file counter affidavits if he wished to rebut the matters presented by Defendants in the special report.  Plaintiff was further advised that such affidavits should be filed within twenty days after receiving a copy of Defendants' special report.

On December 7, 2011, Defendants filed a Special Report accompanied by copies of portions of Plaintiff's medical records and the affidavit of Dr. Hugh Hood.  Thereafter, Plaintiff was notified that he would have twenty days to respond to the motion for summary judgment, filing affidavits or other material if he chose.  Plaintiff was advised of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  On February 22, 2012, Plaintiff filed a response to Defendants' motion for summary judgment.

On July 30, 2012, the court entered an order for a supplemental special report requesting an affidavit from the remaining Defendant doctors.  On August 21, 2012, Defendants filed a supplemental special report accompanied by the affidavits of Dr. Barry Barrett and Debbie Hunt.  Dr. Joiner and Dr. Pauparinas are no longer employed by Corizon and Dr. Hood reports that he does not know their current whereabouts. (Doc.39-1, p.2).[2] Plaintiff was notified that he would have twenty days to respond to the renewed motion for summary judgment, filing affidavits or other material if he chose.  On September 12, 2012, Plaintiff responded with a motion in opposition to summary judgment and attached an affidavit. (Doc. 42).

_____

[2] Dr. Hood testified that Dr. Pouparinas left the employment of Corizon on July 31, 2010, and Dr. Joiner left Corizon's employment on February 10, 2011.

## II.    <u>Summary Judgment Standard</u>

Because the Special Reports of Defendants are being considered a motion for summary judgment, the court must determine whether the moving party, Defendants, are entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Federal Rule of Civil Procedure 56.*  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Barfield v. Brierton*, 883 F.2d 923, 934 (11th Cir. 1989).  Unless Plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1533-34 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted].  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

## III.  Facts for Summary Judgment Analysis

Applying the above standard to the evidence before the court, the following facts are undisputed or, if disputed, are taken in a light most favorable to Plaintiff.  On January 1, 2001, Plaintiff was arrested on a charge of murder and placed in the Marion County Jail. (Doc.1 p.6).   While awaiting trial, Plaintiff became ill and was examined by Dr. Bates who was the doctor at Hamilton A&I at that time.  Dr. Bates diagnosed Plaintiff as having Hepatitis C. (*Id*.).   A CT scan revealed that Plaintiff had an abnormally small liver which has been further compromised by his use of drugs and alcohol. (*Id*.).    Plaintiff was then examined by liver specialists, Drs. Pamela Hughes and Michael Norgord, in Winfield, Alabama.  Plaintiff reports that Drs. Hughes and Norgord diagnosed him as having acute Hepatitis C, cirrhosis of the liver, and splenomegaly and told him that he was a prime candidate for antiviral treatment. (*Id*.).  They also told him he should begin taking Interferon immediately to stop the progression of the liver disease, but there was a six month waiting period to start the Interferon treatments at the Kirklin Clinic in Birmingham. (*Id*.)

In July 2002, Plaintiff was found guilty of manslaughter, sentenced to life in prison, and in 2003 he was transferred to St. Clair Correctional Facility (SCCF).  After arriving at the SCCF, Plaintiff asked Dr. Lawrence, the primary doctor assigned to SCCF, to begin the Interferon treatments.  Plaintiff alleges that Dr. Lawrence told him that the treatments were not required because he did not have long to live. (Doc. 1, p. 8).  Dr. Lawrence prescribed lasix and aldactone for Plaintiff, but did not prescribe any antiviral medication. (*Id.*).

In 2005, Plaintiff was transferred to LCF where he learned that other inmates with Hepatitis C were receiving antiviral medications. (*Id.*).  Plaintiff was followed in the Chronic Care Clinic where blood was drawn periodically to assess his liver functions and he was examined by physician's assistants.  Plaintiff alleges that he asked the physician's assistants to prescribe the antiviral medication, but was repeatedly told it was not necessary at that time. (*Id.*).

Plaintiff alleges that his health has continued to decline over the past seven years, but he has never been examined by a physician. (*Id.*).   Dr. Joiner was the infectious disease doctor at Limestone from 2005 to 2011, but he never examined Plaintiff. (*Id.*)    Dr. Pauparinas was the primary doctor at Limestone from February 2009, through May 2010, but he never examined Plaintiff either. (*Id.*)

In 2010, Plaintiff realized the seriousness of his condition and wrote Health Services Administrator Debbie Hunt asking for some type of medical treatment. (*Id.*, p.9).  Hunt told Plaintiff he would have to undergo a psychiatric screening before being eligible for the

antiviral treatment.  Plaintiff complied with that requirement and was found sound enough to begin treatment.  However, Plaintiff alleges that when he was finally examined by Dr. Barrett, he was told that his blood platelets were too low to tolerate the treatments. (Doc. 1, p.10).

In February 2011, Plaintiff filed a grievance in which he stated that he was dissatisfied with the treatment he had been receiving. (*Id.*).  In April 2011, Debbie Hunt informed Plaintiff that he is not a candidate for anti-viral treatment. (*Id.*).

During his imprisonment, Plaintiff has been monitored in the Chronic Care Clinic, and the "sequelae" of his disease have been treated.  He has been prescribed medication to control fluid retention and ammonia retention, and to reduce "portal pressures."  Dr. Hood testified that Plaintiff was not considered a candidate for interferon treatment of his Hepatitis C because:

> Mr. Gillentine has viral genotype (Type 1-A) which is one of the most difficult to clear with only interferon therapy which was available when he was considered for treatment in 2002.  He was evaluated again for treatment with the current 2 drug regimen in January 2009.  Because response rate for his genotype is poor also with this regimen, and the presence of a low platelet count which is likely to worsen with therapy, he was not accepted for definitive therapy.  The interruption in therapy would further reduce the chances for a sustained viral response.

(Docs. 20-1 and 39-1).  He further opined that Plaintiff's "MELD (Method of End-stage Liver Disease) is 13, which is relatively low as far as his risk for rapidly progressing to death from end-stage liver disease," and that "Mr. Gillentine, at this juncture[,] is not in need of emergency medical care." (*Id.*).

7

Dr. Hood also responded to each of Plaintiff's claims of specific medical care he has been denied. First, Dr. Hood addressed Plaintiff's assertion that he has been denied surgery to remove his swollen spleen. Dr. Hood states, however, that "A splenectomy would likely result in worsening portal hypertension and variceal bleeding which would likely be fatal." (*Id.*). In response to Plaintiff's assertion that he is a candidate for a liver transplant, Dr. Hood states that, "[t]ransplantation would not prevent cirrhosis in the transplanted liver because Hepatitis C virus would still be active." (*Id.*). Even so, Dr. Hood reports that a liver transplant remains one of the treatment options being considered for Plaintiff: "Nevertheless, transplant evaluation has not all together been ruled out at this juncture even with all the risks associated with such a procedure." (*Id.*).

Consideration of treatment options for Plaintiff has been ongoing. Dr. Hood testified that Dr. Joiner saw Plaintiff in January 2009, but concluded he was not an appropriate patient for antiviral treatment. Dr. Hood reports:

> Tommy Gillentine was seen by Dr. Joiner for an evaluation in January 2009. Dr. Joiner specialized in treatment of people with infectious diseases such as Hepatitis C. Dr. Joiner noted on January 13, 2009, that Gillentine was being evaluated for treatment for Hepatitis C. Dr. Joiner noted that Gillentine had several strong contra-indications for Hepatitis C treatment at that time. Gil1entine was noted to have a diagnosis of Cirrhosis since 2002. Dr. Joiner noted that due to Gillentine's high risk/benefit ratio, that Gillentine was being withdrawn from possible Hepatitis treatment.

(*Id.*). Dr. Hood also states, however, that a new three-drug regiment for treating Hepatitis C is now being considered as a treatment option for Plaintiff, although no one has spoken to Plaintiff about it or, apparently, conducted any evaluations of it as a possibility for Plaintiff's

treatment.  Plaintiff has offered a copy of a pamphlet describing a new medication, Inciveck, which is part of a three-drug regiment for treatment of Hepatitis C, purporting to have a 79% success rate at suppressing the Hepatitis C virus.

In addition to Dr. Joiner, Plaintiff has been seen by Dr. Barry Barrett.  During September and October of 2010, Dr. Barrett saw Plaintiff and explained to him why he was not a suitable candidate for antiviral treatment of his Hepatitis C.  Dr. Barrett testified as follows:

> Mr. Gillentine was being carefully monitored and followed for his medical conditions while I was the Medical Director at Limestone.  I had multiple discussions with Mr. Gillentine regarding his medical condition as well as the fact that he was not a candidate for Hepatitis C treatment.

> It had previously been determined by Dr. Joiner, that Hepatitis C treatment would be detrimental to Mr. Gillentine's health as opposed to advantageous.

(Doc. 39-2).

Dr. Hood also met with Plaintiff on several occasions in March, April, and June 2011, concluding that Plaintiff is not a suitable candidate for antiviral treatment.  Dr. Hood testified that:

> I have been personally involved in the evaluation of Mr. Gillentine.  I, along with the other physicians, have made the determination that Mr. Gillentine is not a candidate for Hepatitis C treatment due to his medical problems and current and ongoing condition.

(Doc. 39-1).

Plaintiff alleges that he has been denied adequate medical care, and that Defendants conspired to deny him treatment for his serious medical condition because of the cost of the antiviral treatments.

## IV.   **Discussion**

### A.   **Plaintiff's Claim for Inadequate Medical Treatment**

In order to establish liability under § 1983 for inadequate medical treatment, a prisoner must show that a failure to provide medical treatment amounted to cruel and unusual treatment in violation of the Eighth Amendment.  The Supreme Court has held that it is only "deliberate indifference to serious medical needs of prisoners" which will give rise to a claim of cruel and unusual punishment in violation of the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "Medical treatment violates the Eighth Amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir. 1991), quoting *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir. 1986).  The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983. *Bass v. Sullivan*, 550 F.2d 229, 231 (5th Cir.).

Mere negligence is insufficient to support a constitutional claim. *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979).  As stated by the *Estelle* court, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." 429 U.S. at

106.   Therefore, a mere accidental or inadvertent failure to provide medical care or negligent diagnosis or treatment of a medical condition does not constitute a wrong under the Eighth Amendment. *See Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980).   Neither will a difference of opinion between an inmate and the institution's medical staff, as to treatment and diagnosis, alone give rise to a cause of action under the Eighth Amendment. *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976); *see also Estelle v. Gamble*, 429 U.S. at 106-08. Likewise, even when there is a disagreement between two doctors as to the course of treatment, that also does not state a violation of the Eighth Amendment because there may be several acceptable ways to treat a medical condition. *White v. Napoleon*, 897 F.2d 103, 110 (3rd Cir. 1990).

In *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985), the Eleventh Circuit held that an inmate's dissatisfaction with the medical treatment provided by the prison did not constitute a violation of the Eighth Amendment as long as the treatment provided did not amount to deliberate indifference.   The Eighth Amendment is implicated only when the prison doctors or guards intentionally and deliberately deny or delay access to medical attention to serious medical conditions.   *Barfield v. Brierton,* 883 F.2d  923, 938 (11th Cir. 1989).

Two components must be evaluated to determine whether Plaintiff has been subjected to cruel and unusual punishment.   "First, [the court] must evaluate whether there was evidence of a serious medical need; if so, [it] must consider whether [Defendants'] response

to that need amounted to deliberate indifference." *Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir. 1989).  Clearly, "not every injury or illness invokes the constitutional protection only those that are 'serious' have that effect."*Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1081 (3rd Cir. 1976).  Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  In *Estelle,* the court recognized that medical needs which require medical attention as a matter of constitutional law can range from "the worst cases," producing "physical 'torture or a lingering death,'" to "less serious cases," resulting from the "denial of medical care,"  which could cause "pain and suffering."  *Estelle*, 429 U.S. at 103.  A "serious" medical need has been defined as "one that has either been diagnosed by a physician as mandating medical treatment or one that is so obvious that even a lay person would recognize the need for a doctor's attention." *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977).  *See also Page v. Sharpe*, 487 F.2d 567, 569 (1st Cir. 1973).  It is the necessity (not the desirability) of medical treatment sought which is important to the determination of whether medical officials have exhibited deliberate indifference. *Woodall v. Foti,* 648 F.2d 268, 272 (5th Cir. 1981).

Even if a plaintiff establishes that he has a serious medical need, he must also produce evidence of deliberate indifference. *See Mandel*, 888 F.2d. at 788.  That is, it is not enough that the prisoner shows inadequate treatment of a serious medical need; in order to maintain

an action grounded in the Eighth Amendment, the prisoner must demonstrate that the defendant or defendants possessed the requisite culpable state of mind. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  The requisite state of mind, deliberate indifference, has been compared to the mental state of criminal recklessness. *See Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994).  In ruling that the test for deliberate indifference is subjective, based on the individual's state of mind, rather than objective, based on a reasonable outside observer, the United States Supreme Court has stated that "it is enough that the official act[] or fail [] to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842.  But the Court also noted that "a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*.

"Ultimately," the Eleventh Circuit has stated that "there are thus four requirements: an objectively serious need, an objectively insufficient response to that need, a subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). With these principles in mind, the court will address Plaintiff's claims against the various Defendants in this case.

### 1.   *Plaintiff's Claims Against Dr. Hugh Hood*

In response to Plaintiff's complaint and the court's order for special report, Dr. Hugh Hood, the Associate Regional Medical Director for Corizon, submitted an affidavit in which he states that he oversees the physicians and mid-level medical providers providing medical care to inmates incarcerated with the Alabama Department of Corrections.  Dr. Hood states

that Plaintiff has been followed in the chronic care clinic at the various state prisons where he has been incarcerated since 2002.

Since 2002, Plaintiff has been diagnosed with cirrhosis of the liver, sequelae (which are hypersplenism and ascites), as well as laboratory abnormalities suggested by prolonged prothrombin time, elevated ammonia, and reduced platelet count.[3] (Doc. 20-1, p.2). Plaintiff's fluid retention has been controlled with aldactone and furosemide, ammonia levels have been reduced with lactulose, and portal pressures have been controlled with beta blockade. (*Id.*, p.3). He has viral genotype (Type 1-A) Hepatitis C which, according to Dr. Hood, is one of the most difficult to clear with only interferon therapy, a regime that was available when Plaintiff was considered for treatment in 2002. (*Id.*, p.2)  In 2009, Plaintiff was evaluated again for the current two-drug regimen. (*Id.*)  Plaintiff was not accepted for the new treatment because the response rate for his genotype is also poor with this regimen and when there is the presence of a low platelet count that is likely to worsen with treatment. (*Id.*)  Currently a three-drug regimen is in clinical trials and this might be a consideration for Plaintiff.  (*Id.*)

It is squarely and emphatically within the "medical judgment" of the prison physician to decide what treatment to order and when to change treatment protocols.  The treatment provided Plaintiff was based on the medical staffs' knowledge and understanding of his disease and the treatments available for it.  "[W]hether government actors should have

---

[3] These are the conditions which have developed as a result of the underlying Hepatitis C.

employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir.1995). The existence of a possible alternate course of treatment, which "may or may not" have been successful, is not sufficient to raise an inference of deliberate indifference where the prison officials acted reasonably but ultimately failed to avert the harm. *See Farmer*, 511 U.S. at 844.

Ultimately, Plaintiff's complaint is that the physicians treating him have mistakenly concluded that there is no presently available and effective treatment option for his Hepatitis C. The medical record is clear, and Plaintiff does not dispute, that the medical staff at LCF has monitored his condition, provided treatment for the consequences of his disease, and have periodically assessed him for treatment alternatives. Essentially, his argument is that they should do more. But this assertion attacks the staff's medical judgment, and this court is ill-equipped to second-guess that medical judgment, especially in light of Plaintiff's inability to present expert medical evidence that there are, in fact, available and effective treatment options. Neither Dr. Hood nor any of the other physicians treating Plaintiff has been deliberately indifferent to his medical plight.

### 2. *Plaintiff's Claims Against Doctors Pouparinas, Joiner, and Barrett and Administrator Debbie Hunt*

Dr. Hood responded on behalf of all of Defendants to Plaintiff's allegation that he has been denied adequate medical care while incarcerated. He reviewed the medical records and reported on the treatment Plaintiff received. Plaintiff has made no specific allegations

15

against any of the remaining Defendants.  Nevertheless, the court will analyze Plaintiff's allegations against the other Defendants.

Plaintiff names Dr. Pouparinas as a Defendant, but he complains only that he "was the primary doctor at Limestone from Feb. 2009 to May 2010." Plaintiff states that Pauparinas never saw him, never examined him, and never treated him. (Doc. 1).  Plaintiff does not claim that he submitted a sick call request to see Dr. Pouparinas and it was denied.  The fact that Plaintiff was not examined by a particular staff doctor during the fifteen months the doctor was on staff is not evidence that he was deliberately indifferent to the medical needs of Plaintiff.  In January 2009, Plaintiff was assessed by Dr. Joiner, and again in September and October 2010 by Dr. Barrett.  There is nothing to suggest that Dr. Pouparinas was deliberately indifferent to Plaintiff's medical care.

Plaintiff states that Dr. Joiner was the infectious disease expert at Limestone from 2005 through 2011, but he never examined or treated Plaintiff. (Doc. 1, p.9).  Plaintiff states only that he stopped Dr. Joiner in the hall of the health care unit and asked him why he could not begin receiving antiviral treatments. "Defendant Joiner [sic] reviewed Gillentine's hematological tests to determine which strain of Hepatitis C that Gillentine was infected with. These results of these tests revealed that Gillentine was infected with genotype 1, the worst strain of Hepatitis C virus." (*Id.*)

Dr. Hood responded to the allegations against Dr. Joiner after reviewing the medical records and treatment of Plaintiff.  Dr. Joiner, who specialized in treating patients with

HIV/AIDS and other infectious diseases, was employed by Corizon from August 28, 2008, through February 10, 2011. (Doc. 39-1, p.2).  Dr. Joiner evaluated Plaintiff in January 2009, and noted that he had several strong contra-indications for Hepatitis C treatment at that time.  Dr. Joiner noted that due to Plaintiff's high risk/benefit ratio, that he was being withdrawn from possible Hepatitis treatment. (*Id.*, p.5).  Again, this involves the exercise of medical judgment and this court cannot second-guess that judgment, particularly when there is no expert medical evidence presented which is to the contrary.  Whether Dr. Joiner was right or wrong about the treatment options available is not the issue; the real question is whether he has acted in a deliberately indifferent manner.  He has not.

Plaintiff also names Dr. Barrett as a Defendant and states that he is the doctor who told him that he would not be able to receive the Interferon treatments after all because his blood platelet levels were too low for him to be able to tolerate the treatments. (Doc.1).  The complaint Plaintiff makes against Dr. Barrett is that he did not mention any treatment options or offer any further explanation. (*Id*.).  Dr. Barrett submitted an affidavit in response to Plaintiff's allegations in which he stated:

> Because the response rate for his Genotype is poor, also with current-known drug regiments, and the presence of a low platelet count, which is likely to worsen with therapy, Mr. Gillentine was not accepted for definitive therapy in 2009.  In current clinical trials, a three-drug regiment, which has better efficacy than in the past, could have made Mr. Gillentine a possible candidate for Hepatitis C treatment.

Doc. 39-2, p.1.  This medical judgment does not indicate deliberate indifference, but a good faith assessment of medical options, none of which was very favorable to Plaintiff.

Plaintiff also named Nurse Debbie Hunt as a Defendant and claims that he told her he wanted to receive interferon treatment and she told him that he would have to undergo a psychological examination before treatment.(Doc.1).  Plaintiff reports that he did so and was determined to be sound enough to receive treatment. (*Id*.)  Debbie Hunt was the Health Service Administrator at Limestone Correctional Facility.  Nurse Hunt stated by affidavit that she did not have any part in the diagnosis or treatment of Plaintiff.  Nurse Hunt reported that she met with Plaintiff and Dr. Hood when Dr. Hood explained Plaintiff's diagnosis, condition and treatment options.  Dr. Hood advised Plaintiff that due to the nature of his liver disease, and his medical condition, that he was not a candidate for Hepatitis C treatment. (Doc. 39-3, p.2).  Plainly, a nurse has no authority to overrule a physician and order treatment which the physician, in his medical judgment, does not think appropriate.  Nurse Hunt simply was in no position to provide Plaintiff what he wanted, and she cannot have been the cause of any violation of his rights for that reason.

Plaintiff makes no claims of wrong doing against any of these Defendants except to complain that Dr. Barrett did not mention any treatment options to him.  It is clear that Plaintiff has several serious medical conditions.  He has been examined, evaluated, and treated for those conditions.  Plaintiff disagrees with the current treatment being provided and claims that the failure of Defendants to provide him the treatment he is requesting is evidence

of deliberate indifference.  Over the course of his incarceration, Plaintiff has read extensively about Hepatitis C and educated himself about the various treatments that have been tried with other patients and insists that he should be provided treatments that have been successful for other patients.  The mere fact that the doctors who have treated him and know all of his medical conditions have not prescribed one of those medications or offered him a particular alternative treatment is not evidence of deliberate indifference.  Plaintiff has submitted no facts to show that any of Defendants have been deliberately indifferent to his need for medical care.  For this reason, Defendants are entitled to summary judgment on Plaintiff's claim that they have denied him adequate medical care.

### B.    Claim for Conspiracy

Plaintiff next claims Defendants conspired to deny him adequate medical treatment, but provides no details of the conspiracy.  Allegations of a conspiracy must be specific and based upon facts rather than conclusions. *Fullman v. Graddick,* 739 F.2d 553, 556-57 (11th Cir. 1984).  It is not enough to simply aver in the complaint that a conspiracy existed.  "A complaint may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy."  *Id.* at 557.  On summary judgment, Plaintiff who is attempting to prove a § 1983 conspiracy[4] must show that the parties "reached an understanding" to deny Plaintiff his or her rights. *Addickes v. S.H. Kress & Co.*, 398 U.S.

---

[4]  To the extent that Plaintiff claims to be pleading a § 1985 conspiracy, he has not alleged any racial discrimination or animus, or any violation of his equal protection rights.  Although the intracorporate conspiracy doctrine does not apply to § 1985(2) claims, the absence of an allegation of racial discrimination is fatal to such a claim.

144, 152 (1970).  That is, Plaintiff must show some evidence of an agreement between Defendants. *Bailey v. Bd. of County Comm'rs of Alachua County*, 956 F.2d 1112, 1122 (11th Cir. 1992); *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir 2010).

Plaintiff has alleged no facts in support of his claim that Defendants conspired to deny him adequate medical treatment and this claim is due to be dismissed.

Moreover, even if Plaintiff had attempted to allege facts showing some agreement among Defendants to deprive him of needed medical case, the intracorporate conspiracy doctrine prevents the finding of an actionable conspiracy.  As the Eleventh Circuit has explained:

> "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy."  *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (*en banc*).  "[U]nder the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Id*....

*Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010), quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (*en banc*).  All of Defendants here are Corizon and its employees.  Under the intracorporate conspiracy doctrine, they are legally incapable of forming a conspiracy among themselves.

### C.   Plaintiff's Claims Against Correctional Medical Services, Inc.

In addition to naming the various doctors as Defendants, Plaintiff names Correctional Medical Services, Inc.("CMS"), the corporation providing medical services for the prisons

at the time of the events that are the basis of this action.[5]   While a corporation providing

prison medical services may be liable under § 1983 if it is established that the constitutional

violation was the result of the corporation's policy or custom, *see Buckner v. Toro,* 116 F.3d

450 (11th Cir. 1997); *Ort v. Pinchback*, 786 F.2d 1105, 1107 (11th Cir. 1986), that is not the

case when the § 1983 claim against the corporation is based merely on *respondeat superior.*

*See Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992)*; Monell v. Department of*

*Social Services*, 436 U.S. 658, 691 (1978).  Plaintiff claims that the real reason he has been

denied antiviral medications is not out of legitimate medical concerns, but financial ones.

(Doc. 1 p. 10).  Dr. Hood  states by affidavit that economic issues have played no role in the

treatment and evaluation of Plaintiff (Doc. 20-1, p.4), and Plaintiff has offered no factual

allegations, beyond his own speculation, to dispute this evidence.  In fact, Dr. Hood's

testimony is supported by Plaintiff's own report that other inmates at LCF who have

Hepatitis C *are* receiving antiviral treatment, despite the alleged financial concerns. (Doc.

1, p.8).

### D.     Plaintiff is Not Entitled to Injunctive Relief

What is clear from the court's discussion so far is that Plaintiff is not entitled to any

monetary relief against these Defendants for denial of necessary medical care to this point

in time.  Further, it is equally clear that Plaintiff is not entitled to any injunctive relief to

---

[5] Correctional Medical Services, Inc., was the former medical care provider for the Alabama Department of Corrections.  The current provider is Corizon, Inc., which formerly was Correctional Medical Services, Inc.

compel any of the Defendants to provide a certain type of medical treatment. First, Defendants Joiner, Pouparinas, Barrett, and Hunt are no longer employed by Corizon or involved in providing medical care to prisoners. As to these four Defendants, Plaintiff's request for injunctive relief is moot. While Corizon and Dr. Hood are still involved in Plaintiff's treatment, the court rejects the assertion that Plaintiff is entitled to injunctive relief against them, at least on the factual circumstances alleged in this case. It is clear that, while Plaintiff is dissatisfied with the type of medical treatment he is receiving, it is also clear that Defendants have made reasonable medical judgments about the property treatment he requires. The court is not equipped to second-guess the medical judgments of Corizon and Dr. Hood, or to require them to provide a medical treatment the court has no way of knowing is useful, efficacious, and not harmful to Plaintiff, despite their conclusion that such treatment would not be appropriate. Thus, at this point in time, and based on the facts as they now exist, Plaintiff cannot show any entitlement to injunctive relief.[6]

### E.   Supplemental State Law Claims

Title 28, U.S.C. § 1367(c)(3) provides in pertinent part that, "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if–. . . (3) the district court has dismissed all claims over which it has original jurisdiction, . . .." The court

---

[6] This is simply not a case in which proof has been offered that an effective treatment for Hepatitis C like Plaintiff's has been developed but denied Plaintiff, or that Defendants have ceased making reasonable medical assessments of the availability of treatment options for him.

declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  Accordingly, those claims should be dismissed, without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).

## V.    **Conclusion**

By separate Order, the court will grant the motion for summary judgment by Defendants and dismiss this action.

The Clerk is **DIRECTED** to serve a copy of this Memorandum Opinion upon Plaintiff and upon counsel for Defendants.

**DONE** and **ORDERED** this ____18th_____ day of September, 2012.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE