# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JOEL GILLENTINE, as the Personal** | } | |
| **Representative of the Estate of Tommy** | } | |
| **James Gillentine, Deceased,** | } | |
| | } | |
| **Plaintiff,** | } | **Case No.:  5:11-cv-02694-RDP-TMP** |
| | } | |
| **v.** | } | |
| | } | |
| **CORRECTIONAL MEDICAL** | } | |
| **SERVICES, INC., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

### I.      Introduction

This case is before the court on Defendants' Special Report filed December 7, 2011 (Doc. # 20), Response to Court Order filed August 21, 2012 (Doc. # 39), and Response to Court Order filed November 17, 2015 (Doc. # 71).  The court has construed these filings as motions for summary judgment.  (*See* Docs. # 24, 40, 73).  Tommy James Gillentine ("Gillentine"), the deceased prisoner who initiated this action, responded to Defendants' December 2011 Special Report and their August 2012 Response.  (*See* Docs. # 26, 42).  The court invited Plaintiff[1] to address Defendants' November 2015 Response, (*see* Docs. # 73, 76, 79), but Plaintiff has failed to respond to Defendants' latest motion for summary judgment.  Accordingly, Defendants' motions for summary judgment are under submission.

In this long-pending action, Gillentine alleged that he was deprived of rights afforded to him by the Eighth Amendment of the Constitution by Defendants Debbie Hunt, R.N., Dr. Hugh

---

[1]  To aid its clarity, this opinion refers to the original plaintiff, Tommy Gillentine, by his last name.  It refers to Joel Gillentine, the personal representative for the original plaintiff's estate, as Plaintiff.

Hood, Dr. Barry Barrett, Dr. Earl Joiner, Dr. Manuel Pouparinas, and Correctional Medical Services, Inc.[2]  In particular, Gillentine claimed that he was denied adequate medical care for his chronic Hepatitis C condition during his fourteen years of incarceration.  As compensation for the alleged constitutional violations, Gillentine sought monetary damages, declaratory relief, and injunctive relief.  The court previously granted Defendants summary judgment on all of the federal-law claims in this action and declined to exercise supplemental jurisdiction over the state-law claims, (*see* Docs. # 43-44), but the Eleventh Circuit vacated this court's judgment, (Doc. # 56).  Now, the court considers anew whether Defendants are entitled to summary judgment.[3]  After careful review, and for the reasons explained below, the court concludes that Defendants are entitled to summary judgment for all of Plaintiff's federal-law claims.  In addition, the court again declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.

## II.    The Relevant Procedural History

Gillentine filed his complaint under 42 U.S.C. §§ 1983 and 1985, based on his allegations that Defendants had been deliberately indifferent towards his medical needs and had inflicted cruel and unusual punishment upon him by failing to provide him with adequate medical treatment.  (*See* Doc. # 1 at ¶¶ 72-75, 77-80, 82-85, 87-90, 92-95, 97-100).  Gillentine also asserted state-law claims of negligence against Defendants for failing to provide adequate medical treatment.  (*Id.* at ¶¶ 76, 81, 86, 91, 96, 101).  Along with his complaint, Gillentine filed a motion for injunctive relief that sought emergency medical treatment.  (Doc. # 3).  The court denied Gillentine's motion for injunctive relief.  (Doc. # 9).

---

[2]  Correctional Medical Services, Inc., has changed its name to Corizon, and the court will refer to it as Corizon in this opinion.

[3]  As the court has already issued an order for Plaintiff to respond to Defendants' latest report (to no avail), the court hereby withdraws its referral of this case to the Magistrate Judge.

The Magistrate Judge directed that copies of the complaint in this action be forwarded to each of the Defendants and requested that they file a special report addressing the factual allegations in Gillentine's complaint.  (Doc. # 11).  Defendants were advised that their special report could be construed as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (*Id.* at 6).  In December 2011, Defendants submitted a special report, which constituted the first summary judgment motion addressed in this opinion.  (Doc. # 20).

In February 2012, Gillentine moved for the court to appoint him an expert witness.  (Doc. # 28).  The Magistrate Judge denied this motion.  (Doc. # 35).  Later that year, he ordered Defendants to submit a supplemental special report.  (Doc. # 38).  Defendants submitted the supplemental report and the court construed it as a motion for summary judgment.  (Docs. # 39, 40).  Gillentine responded in opposition to summary judgment and included an affidavit.  (Doc. # 42).  The court granted Defendants' motions for summary judgment.  (Docs. # 43, 44).

On appeal, the Eleventh Circuit vacated the court's grant of summary judgment and remanded for further proceedings.  *Gillentine v. Correctional Medical Services*, 556 F. Appx. 845, 845 (11th Cir. 2014) (unpublished).  The Eleventh Circuit determined that the court erred by denying Gillentine's motion for appointment of an expert witness on the ground that it lacked discretionary authority to appoint such a witness.  *Id.* at 846.  It directed this court to consider Gillentine's request for appointment of an expert witness under the discretionary standard provided in Federal Rule of Evidence 706.  *Id.* at 847.

Following remand, in November 2014, the court, applying the discretionary standard, again denied Gillentine's motion to appoint an expert witness.  (Docs. # 59 at 2-3; 60 at 1).  The court identified the factors that it could consider under Rule 706 when reviewing whether to appoint an expert for a party.  (*Id.* at 8).  Applying those factors, the court decided, in its

discretion, to not appoint Plaintiff an expert witness because (1) Drs. Hood and Barnett had explained why Gillentine was not a proper candidate for the medical treatment that he sought, (2) Defendants had presented evidence regarding their monitoring and treatment of Plaintiff's medical condition, and (3) a medical expert would have provided little assistance to Gillentine in demonstrating that Defendants were deliberately indifferent towards his medical needs. (*Id.* at 9-10). In the order denying Gillentine's motion for appointment of an expert witness, the court directed Defendants to file additional evidence relating to Gillentine's medical condition and treatment since August 2012. (Doc. # 60 at 1-2).

Defendants responded to the court's order with an affidavit from Dr. April Truett and Gillentine's medical chart from August 2012 to November 2014. (Doc. # 62). In August 2015, Corizon informed the court that Gillentine had passed away. (Doc. # 64). Thereafter, Plaintiff appeared on behalf of Gillentine's estate. (Doc. # 67).

In October 2015, the Magistrate Judge directed Defendants to submit medical evidence and affidavits addressing Gillentine's medical condition from November 2014 to the time of his death. (Doc. # 68 at 2). Defendants complied with this order (*see* Doc. # 71), and the Magistrate Judge construed their response as a motion for summary judgment. (Doc. # 73). The Magistrate Judge directed Plaintiff to respond to Defendants' latest summary judgment motion, but Plaintiff has failed to respond to this motion, despite the court's order directing Plaintiff to inform the court whether he would respond. (*See* Doc. # 79). Nevertheless, it is axiomatic that the court cannot grant a defendant summary judgment as a matter of default based solely on a plaintiff's failure to oppose a motion for summary judgment. *See United States v. One Piece of Real Property Located at 5800 Sw. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[S]ummary judgment, even when unopposed, can only be entered when appropriate." (internal

quotation marks omitted)).  Instead, the court must review the materials submitted in support of Defendants' motions, along with the evidence that Gillentine filed in opposition to Defendants' prior motions for summary judgment, to determine whether summary judgment is warranted.  *Id.* at 1101-02.

### III.    The Rule 56 Evidence and the Undisputed Facts[4]

On January 1, 2001, Gillentine was arrested, charged with murder, and placed in the Marion County Jail.  (Doc. # 1 at ¶ 12).  While awaiting trial, Gillentine became ill and was examined in March 2001 by a doctor pursuant to a court order.  (*Id.* at ¶¶ 13, 15).  The doctor diagnosed Gillentine with Hepatitis C.  (*Id.* at ¶ 16).  His "abnormally small liver" had suffered additional damage due to his alcohol and drug use.  (*Id.* at ¶ 17).  Two liver specialists diagnosed him with acute Hepatitis C infection, cirrhosis of the liver, and an enlarged spleen.  (*Id.* at ¶ 19).

In 2002, a jury convicted Gillentine of manslaughter, and an Alabama state court sentenced him to life imprisonment.  (*Id.* at ¶¶ 21, 24).  In 2003, he was transferred to St. Clair Correctional Facility.  (*Id.* at ¶ 25).  Gillentine received no antiviral treatments while housed in St. Clair, but his complaint indicates that none of the Defendants in this action treated him at St. Clair.  (*See id.* at ¶¶ 31-33 (alleging that Gillentine received medical care from NaphCare Medical Services and "Dr. Lawrence")).  According to Dr. Hood, Gillentine's Hepatitis C infection was difficult to treat with the antiviral drug available in 2002 for Hepatitis C (interferon) because Gillentine was infected with viral genotype 1-A.  (Doc. # 20-1 at 2).  In

---

[4]    The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial.  *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

2005, the Alabama Department of Corrections ("ALDOC") transferred Gillentine from St. Clair to Limestone Correctional Facility ("Limestone").  (Doc. # 1 at ¶ 37).

Corizon has contracted with ALDOC since November 2007 to provide medical services to Alabama prisoners, including those housed at Limestone.  (Doc. # 71-1 at 2).  Dr. Hood served as Corizon's associate regional medical director and oversaw the "physicians and mid-level medical providers" who worked at Alabama's prisons.  (Doc. # 39-1 at 1-2).  Dr. Joiner served as an infectious disease specialist for Corizon between August 2008 and February 2011.  (*Id.* at 2).  Dr. Barrett was the medical director at Limestone between September 2010 and February 2012.  (Doc. # 39-2 at 1).  Corizon employed Dr. Pouparinas from May 2009 to July 2010.  (Doc. # 39-1 at 2).  Finally, Hunt served as a health services administrator at Limestone.[5]  (Doc. # 39-3 at 1).  Hunt was responsible for responding to inmate grievances but rarely provided in-person medical care to inmates.  (*Id.* at 2).

Dr. Hood has averred that Gillentine suffered from several secondary conditions associated with his Hepatitis C infection, including cirrhosis of the liver, hypersplenism,[6] ascites,[7] "laboratory abnormalities suggested by prolonged prothrombin time," elevated ammonia levels, and reduced platelet count (also known as thrombocytopenia).  (Doc. # 20-1 at 2).  He received prescription medication and other forms of treatment to manage these secondary conditions associated with Hepatitis C.  Dr. Hood described the treatment Gillentine had

---

[5]  Although the record does not clearly indicate whether a health services administrator in an Alabama prison works for Corizon or ALDOC, ALDOC's regulations indicate that a health services administrator is an ALDOC employee.  *See* Ala. Dep't of Corrections, Admin. Reg. No. 703(IV)(C), http://doc.alabama.gov/docs/AdminRegs/AR703.pdf (outlining the responsibilities of a health services administrator).

[6]  Hypersplenism is a condition where an individual's overactive spleen removes blood cells too quickly from the bloodstream.

[7]  Ascites are build-ups of fluid in the space between the lining of the abdomen and the abdominal organs.

received for these conditions as follows: "Fluid retention is being controlled with aldactone and furosemide, ammonia levels have been reduced with lactulose, and portal pressures have been controlled with beta blockade." (*Id.* at 3). Indeed, Gillentine never disputed that Defendants have provided him with some medical treatment for the conditions associated with his Hepatitis C infection.[8] (*See, e.g.*, Docs. # 1 at ¶ 68 ("The only forms of treatment that Defendants . . . have afforded Gillentine are the oral medications of lasix, aldactone, and potassium pills."); 26 at 14 ("The Defendants have only treated the secondary symptoms [of Hepatitis C], but have not treated the infection itself.")).

Rather, Gillentine has challenged Defendants' failure to provide prescription medication and other forms of treatment to directly combat his Hepatitis C infection. According to Gillentine, Defendants withheld antiviral treatment and failed to provide any treatment "to halt or slow the progression of [his] cirrhosis [and] liver disease." (Doc. # 26 at 15). Moreover, Gillentine has complained that he was never examined by Dr. Joiner or Dr. Pouparinas, although he has admitted that Dr. Joiner reviewed his blood tests. (Doc. # 1 at ¶¶ 44-45, 47).

According to Dr. Hood, Dr. Joiner examined Gillentine in January 2009 and evaluated whether he should receive antiviral treatment for Hepatitis C. (Doc. # 39-1 at 5). Dr. Joiner noted "several strong contra-indications" for antiviral treatment, including cirrhosis and low platelet count. (*Id.*; Doc. # 20-1 at 2-3). Because of "Gillentine's high risk/benefit ratio," Dr. Joiner withdrew him from consideration for Hepatitis C treatment. (Doc. # 39-1 at 5).

---

[8] In Gillentine's December 2014 affidavit, he complained that he had been admitted to a hospital in 2013 after he had lost consciousness due to elevated ammonia levels. (Doc. # 63 at 2). He averred that his ammonia levels had risen due to a "lack of properly prescribed medication" at Limestone. (*Id.*). However, Gillentine did not raise a deliberate indifference claim in his complaint relating to Defendants' failure to provide prescribed medication for secondary effects of Hepatitis C, he has not sought to amend his complaint following remand, and he has not filed a new complaint concerning the 2013 incident. And Gillentine was not allowed to raise a new claim through a brief or affidavit opposing summary judgment. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Therefore, any deliberate indifference claim concerning Defendants' failure to provide medication to Gillentine in 2013 is not properly before the court.

According to Dr. Barrett, Dr. Joiner had determined "that Hepatitis C treatment would be detrimental to Mr. Gillentine's health." (Doc. # 39-2 at 3). Indeed, Limestone medical officials performed five blood tests on Gillentine in 2008 and 2009; each blood test found that Gillentine's low platelet count (described as thrombocytopenia) was an absolute contraindication for Hepatitis C treatment. (*See* Doc. # 20-2 at 3).

Dr. Barrett examined Gillentine three times in September and October 2010. (Doc. # 39-1 at 5-6). He noted that Gillentine was suffering from Hepatitis C, cirrhosis, and elevated ammonia levels. (*Id.*). In March 2011, Dr. Hood met with Gillentine following his filing of a grievance and "had a very long discussion with Mr. Gillentine about his diagnosis of Hepatitis C [ ] and why he did not qualify as a candidate for Hepatitis C treatment." (*Id.* at 6). Dr. Hood informed Gillentine in April 2011 that Hepatitis C treatment was not recommended because he was unlikely to benefit from treatment due to his end-stage liver disease. (*Id.*).

Gillentine has asserted that Defendants' monitoring of his Hepatitis C infection provided no treatment to resolve his infection. (Doc. # 26 at 15-16). Moreover, prison officials denied his request for a splenectomy to resolve his enlarged spleen "without explanation." (Doc. # 1 at ¶ 51). Dr. Hood averred in 2011 that "[a] splenectomy would likely result in worsening portal hypertension and variceal bleeding which would likely be fatal." (Doc. # 20-1 at 3). Likewise, a liver transplant "would not prevent cirrhosis in the transplanted liver because Hepatitis C virus would still be active." (*Id.*).

In December 2011, June 2012, and July 2012, medical staff at Limestone confirmed that Gillentine's low platelet count still prevented him from being eligible for Hepatitis C treatment. (*See* Doc. # 62-1 at 33). Likewise, Gillentine's low platelet count continued to be an absolute contraindication for Hepatitis C treatment from October 2013 to August 2014. (*See id.* at 5).

In November 2014, Dr. April Truett, Corizon's regional infectious disease director, affirmed that the medical staff at Limestone had "closely monitored" Gillentine's condition "to determine if any medical treatment would be beneficial as opposed to detrimental to his well-being." (Doc. # 62 at 3-4). In October 2014, the Food and Drug Administration ("FDA") approved a "combination pill", Harvoni, for Hepatitis C genotype 1-A that did not require a patient to use interferon or ribavirin.[9] (Doc. # 71-1 at 3). Thereafter, the American Association for the Study of Liver Diseases published guidelines for treating Hepatitis C in individuals with decompensated cirrhosis, and Dr. Truett reviewed whether the ALDOC prisoners under Corizon's care qualified for the new treatment. (*Id.* at 3-4).

A CT scan of Gillentine's abdomen was conducted in December 2014 and found a small abnormality. (*Id.* at 4). Gillentine was evaluated again in February 2015 and received follow-up tests. (*Id.* at 5). In April 2015, Gillentine was approved for antiviral treatment with Harvoni and ribavirin after medical officials had ruled out the possibility of cancer. (*Id.* at 6). And "Gillentine stayed on the medically appropriate medications through the time of his hospitalization." (*Id.*). Tests performed in July 2015 found undetectable levels of Hepatitis C virus in his blood. (*Id.*). Nevertheless, Gillentine suffered from renal failure in August 2015, which led to multiple organ failure and his death. (*Id.*).

Gillentine's autopsy report described his August 2015 hospital admission as follows:

On 08/07/15[,] he was admitted to Crestwood Medical Center for a chief complaint of altered mental status. He had started on Harvoni and Ribavirin 9 weeks prior. He had been doing well up until 1 week prior to death. He developed a feeling of generalized illness with decreased oral intake. The patient developed mental fogging and slurred speech on 08/07/15 and was brought to the ER. The patient had several episodes of hepatic encephalopathy, but for the last year he had not had an episode. . . . He was initially admitted with the

---

[9]   At that time, the guidelines issued by the American Association for the Study of Liver Diseases directed doctors to not administer interferon to patients with decompensated cirrhosis. (Doc. # 71-1 at 3-4).

aforementioned diagnoses but was also found to have possible hemolysis from his ribavirin. . . .

While in the ICU[,] the patient's clinical status slowly continued to deteriorate. His liver functions continued to worsen. . . . It was felt he was developing fulminant hepatic failure.  Eventually with his family support he elected to be [put on] comfort measures only.  He was started on comfort medications and passed away shortly thereafter on 8/20/15.

(Doc. # 71-7 at 4-5).  The autopsy concluded that Gillentine died due to complications from liver cirrhosis and end-stage liver disease.  (*Id.* at 10).

IV.  **Summary Judgment Standard**

Because the Defendants' special reports are being considered as motions for summary judgment, the court must determine whether Defendants are entitled to judgment as a matter of law.  Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.  Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*").  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Allen v.*

*Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents

a sufficient disagreement to require submission to the jury or whether it is so one-sided that one

party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477

U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999)

("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a

motion for summary judgment.").

## V.     Gillentine's Motion for Appointment of an Expert Witness

Along with his response to Defendants' first special report, Gillentine requested that the

court appoint an expert witness to represent his interests, as Defendants argued in their special

report that he needed expert testimony in order to counter Dr. Hood's affidavit.  (*See generally*

Doc. # 28).  After the Eleventh Circuit vacated the court's judgment and remanded this action for

reconsideration of Gillentine's motion for appointment of an expert witness, the court denied the

motion and issued an opinion outlining why, even when applying a discretionary standard as

directed by the court of appeals, appointment of an expert was not warranted under Rule 706.

(*See* Docs. # 59-60).

After careful review of the Defendants' special reports, Gillentine's responses to those

reports, and Gillentine's medical record, the court reiterates that there are instances when the

appointment of an expert witness to assist someone such as Gillentine (or Plaintiff) may be

appropriate under Rule 706.  But, the record currently before the court weighs more heavily

against Gillentine's request for an expert because it demonstrates that medical officials approved

antiviral treatment for Gillentine once an appropriate protocol became available.  Moreover,

Corizon's employees regularly monitored Gillentine's Hepatitis C, examined whether he was

eligible for antiviral treatment under evolving guidelines, and provided medical care to control

his symptoms.  Thus, contrary to Defendants' previous argument (*see* Doc. # 20 at 13-16), an

expert is unnecessary here because the record before the court is sufficient to address all of Gillentine's Section 1983 claims.[10]   For these reasons, the court has declined to exercise its discretion to appoint Gillentine an expert witness pursuant to Federal Rule of Evidence 706.

## VI.   Analysis of Defendants' Motions for Summary Judgment

In his complaint, Gillentine raises claims that fall within three categories: (1) denial of adequate medical treatment and deliberate indifference towards Gillentine's known medical needs, in violation of 42 U.S.C. § 1983 and the Eighth Amendment of the Constitution; (2) conspiracy to deny Gillentine adequate medical treatment, in violation of 42 U.S.C. §§ 1983 and 1985; and (3) negligence for failing to provide adequate medical treatment, in violation of Alabama Code § 6-5-410.  (*See generally* Doc. # 1 at ¶¶ 72-101).

### A.   Defendants Are Entitled to Summary Judgment for Gillentine's Section 1983 Claims of Inadequate Medical Treatment and Deliberate Indifference to a Serious Medical Need

Gillentine has contended that all Defendants rendered inadequate medical care for his Hepatitis C condition and acted with deliberate indifference towards it by providing no treatment for the underlying Hepatitis C infection.  The Eighth Amendment prohibits cruel and unusual punishment, which includes deliberate indifference to a prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The Eleventh Circuit has "consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate

---

[10]   While Defendants referred to Alabama's expert testimony requirements for medical malpractice claims in their first special report, they did not clearly indicate whether Gillentine needed expert testimony to support all of his claims or just his state-law claims.  (*See* Doc. # 20 at 16 ("Therefore, Gillentine must produce such [expert witness] evidence or his claims must be dismissed.")).  It also is notable that in his response to the first special report Gillentine did not need to present expert testimony because he had not raised a medical malpractice claim.  (Doc. # 26 at 10).  Gillentine conceded that he had not raised a medical malpractice claim but argued that he could present a negligence claim against Defendants.  (*Id.* at 9).  He only purported to seek the appointment of an expert if the court required him to produce expert testimony in order to get past summary judgment (presumably on his negligence claim).  (*Id.* at 10-11).  As the court explained in its order denying Gillentine's motion for appointment of an expert witness, expert testimony would not have aided Gillentine in establishing that Defendants acted with deliberate indifference towards his medical conditions or that they conspired to deny him adequate medical care.  And, as explained below, the court declines to exercise supplemental jurisdiction over Gillentine's state-law claims.

indifference." *Adams v. Poag*, 61 F.3d 1537, 1543-44 (11th Cir. 1995) (citing *Carswell v. Bay Cnty.*, 854 F.2d 454, 457 (11th Cir. 1988), and *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir 1985)).  However, not every claim of inadequate medical treatment states a cognizable claim under the federal constitution.  "Medical treatment [is deliberately indifferent] only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (citation omitted).  To establish that a medical provider or jail official was deliberately indifferent to his or her serious medical need, a prisoner must meet both an objective and a subjective standard of proof.  *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999).

To establish the objective component, a prisoner is required to show both (1) an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and (2) that the response by the prison official to that need was poor enough to constitute an unnecessary and wanton infliction of pain.  *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000).  An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks omitted).  Here, neither party has disputed, and the court recognizes, that Hepatitis C presents an objectively serious medical need.  *See Loeber v. Andem*, 487 F. Appx 548, 549 (11th Cir. 2012) (unpublished).  In cases alleging a delay in treatment, even when treatment is ultimately provided, deliberate indifference may be "inferred from an unexplained delay in treating a known or obvious serious medical condition."  *Harris v. Coweta Cnty., Ga.*, 21 F.3d 388, 394 (11th Cir. 1994).

To establish the subjective component, a prisoner must establish (1) subjective knowledge of a risk of serious harm, (2) disregard of that risk, and (3) that the conduct committed by the prison official was more than merely negligent. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Additionally, as with any tort claim, the prisoner must show that an injury was caused by the defendant's wrongful conduct. *See Hale v. Tallapoosa Cnty., Ala.*, 50 F.3d 1579, 1582 (11th Cir. 1995). It is not enough to show that the care provided was less than optimal, or that a different course of treatment might have been preferable. The required subjective elements of a deliberate indifference claim ensure that accidental inadequacy, negligent diagnosis or treatment, and even medical malpractice are not actionable under Section 1983. *Taylor*, 221 F.3d at 1258. The requisite standard of mind, deliberate indifference, has been compared to the mental state of criminal recklessness. *See Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994). A prisoner also cannot establish a constitutional violation simply because he or she "may have desired different modes of treatment" than that which was provided to him or her. *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985). Such a course of treatment claim, by definition, involves the exercise of professional judgment and as such is not actionable under the Eighth Amendment. "Ultimately," as the Eleventh Circuit has stated, "there are thus four requirements: an objectively serious need, an objectively insufficient response to that need, a subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258.

Several cases have discussed deliberate indifference claims premised upon a failure to provide antiviral treatment for Hepatitis C. In *Black v. Alabama Department of Corrections*, the Eleventh Circuit addressed a similar deliberate indifference claim where a prisoner (at Limestone) had not received antiviral drug treatment because he was ineligible for drug

treatment based on ALDOC's policy. 578 F. Appx 794, 794-95 (11th Cir. 2014) (unpublished). The Eleventh Circuit, affirming this court's grant of summary judgment to the defendants on a deliberate indifference claim, explained as follows:

> In Black's case, however, it is also undisputed that Black received regular care and close monitoring of his Hepatitis C. The Alabama DOC policy, adopted from the Federal Bureau of Prisons, sets forth criteria inmates must satisfy for placement in its Hepatitis C Treatment Program, in which inmates are considered for antiviral drug treatment. The policy prioritizes referral of inmates for antiviral drug treatment based on lab results. The medical staff at Limestone's Chronic Care Clinic routinely monitored Black's lab results to determine if he was a candidate for the program. Black's periodic liver function and liver enzyme test results were in the normal range and indicated that his condition was stable. Black's stable condition made him ineligible for placement in the Hepatitis C Treatment Program. Meanwhile, Limestone's medical staff continued to monitor Black and treated his symptoms . . . .
>
> Throughout, Black received regular care and monitoring for his Hepatitis C and medication for his symptoms, such as Lactulose to manage his blood ammonia levels. Black's condition remained stable, and he never had medical issues requiring immediate admission to the Hepatitis C Treatment Program. Moreover Black did not suffer any negative health consequences from not being in the Hepatitis C Treatment Program.
>
> Contrary to Black's claims, this is not a case of denied or delayed treatment. Rather, the record establishes that Black received treatment for his Hepatitis C. Moreover, given the undisputed facts, no reasonable jury could conclude that the defendants, in treating Black, knowingly disregarded a serious risk of harm to him or that the treatment given amounted to more than gross negligence.

*Id.* at 795-96.

In *Loeber*, the Eleventh Circuit affirmed the dismissal of a deliberate indifference claim where the prisoner's Hepatitis C condition had been treated with lactulose instead of interferon or ribavirin. 487 F. Appx. at 549. It recognized that the defendants in that case had chosen lactulose as an alternative treatment to the antiviral medications requested by the prisoner. *Id.* But it held that the failure to prescribe antiviral medication did not establish a cognizable deliberate indifference claim because a doctor's decision to prescribe antiviral medication for

Hepatitis C is a highly individualized determination that depends on many factors.  *Id.*  In an opinion relied upon by the *Loeber* court, the Eighth Circuit discussed some of the factors doctors must consider before prescribing interferon to combat Hepatitis C:

> Treatment is not appropriate for patients with advanced liver problems such as cirrhosis.  Treatment for patients with mild liver problems may be safely deferred.  Suitability for treatment is determined by measuring the degree of liver inflammation and fibrosis through a liver biopsy.  However, even if the appropriate threshold levels of inflammation and fibrosis are present, treatment may be inappropriate if the patient is too young or too old, had a previous organ transplant, or suffers from depression, other mental health problems, heart disease, or untreated chemical dependency.

*Bender v. Regier*, 385 F.3d 1133, 1135 (8th Cir. 2004).

Here, Plaintiff has failed to demonstrate that any of the Defendants (or, for that matter, any individual who provided treatment to Gillentine while at Limestone) provided objectively insufficient care in response to Gillentine's Hepatitis C infection or that they were deliberately indifferent to this condition.  *Taylor*, 221 F.3d at 1258.  As *Black* and *Loeber* confirm in the context of antiviral treatment for Hepatitis C, a prison physician has the medical judgment to decide what treatment to order and when to change treatment protocols for Hepatitis C.  The treatment provided to Gillentine was based on the medical staff's knowledge and understanding of his disease and the treatments available for it. "[W]hether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for liability under the Eighth Amendment." *Adams¸* 61 F.3d at 1545 (internal quotation omitted).  The existence of a possible alternate course of treatment, which may or may not have been successful, is not sufficient to raise an inference of deliberate indifference where the prison officials acted reasonably but ultimately failed to avert the harm.  *See Farmer*, 511 U.S. at 844-45.

The undisputed record confirms that Drs. Joiner and Barrett assessed Gillentine's medical records and concluded that he should not receive antiviral treatments.  Moreover, Limestone's medical staff periodically checked Gillentine's lab results and found that his low platelet count was an *absolute* contra-indication for antiviral treatment.  They considered his proposals for alternative treatments (splenectomy and liver transplant) and have explained to the court why both surgeries were too risky.  In addition, Dr. Truett re-assessed whether Gillentine should receive antiviral treatment when a new drug and new guidelines became available in late 2014, and, after some diagnostic tests, Gillentine received that particular antiviral treatment for his Hepatitis C infection in 2015.  Thus, (1) Gillentine in fact received care for his Hepatitis C throughout his incarceration at Limestone, if not the treatment he wanted, and (2) Plaintiff cannot show any unexplained delay in Gillentine's antiviral treatment.  Drs. Hood, Barrett, and Truett have more than adequately explained why they did not provide interferon to Gillentine.  *Cf. Harris*, 21 F.3d at 394.

Gillentine has argued that an inmate has a right to be treated for Hepatitis C and in support of that contention he cites *Johnson v. Wright*, 412 F.3d 398 (2d Cir. 2005), and *McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004).  Neither case is binding and, in any event, both cases are easily distinguishable from the present action.  In *McKenna*, the Second Circuit addressed whether a defendant could receive qualified immunity at the motion-to-dismiss stage where a prisoner alleged that he had been denied antiviral treatment for Hepatitis C under a rule that prohibited such treatment where a prisoner might be released within twelve months of starting treatment.  *See* 386 F.3d at 436-38.  The Second Circuit only reviewed whether the prisoner's allegations sufficiently pled a case of deliberate indifference and readily acknowledged that the defendants might be in a different position at the summary-judgment stage.  *See id.* at 437.

Unlike the *McKenna* court, this court is reviewing motions for summary judgment and has provided both Plaintiff and Gillentine opportunities to present evidence supporting the complaint's allegations. The Second Circuit's *Johnson* opinion is likewise distinguishable from this case because, in *Johnson*, the prisoner's treating physicians recommended that the prisoner receive antiviral medication. *See* 412 F.3d at 400 ("Because the defendants reflexively applied [Department of Corrections] policy in the face of the unanimous, express, and repeated—but contrary—recommendations of plaintiff's treating physicians, including prison physicians, we believe a jury could reasonably find that the defendants here acted with deliberate indifference to the plaintiff's medical needs."). As explained more fully above, Gillentine's physicians did not recommend that he receive antiviral medication until Harvoni was approved by the FDA and guidelines were issued for treating Hepatitis C in patients with cirrhosis. Thus, the case law cited by Gillentine does not support his argument that Corizon's and Limestone's medical personnel acted with deliberate indifference towards his Hepatitis C condition.

Ultimately, Gillentine's complaint is this: the physicians who treated him throughout his stint at Limestone mistakenly concluded that there was no available and effective direct treatment option for his Hepatitis C until 2015. The medical record is clear, and Plaintiff does not dispute, that the medical staff at Limestone monitored Gillentine's condition, provided treatment for the secondary consequences of his disease, and periodically assessed him for antiviral treatment eligibility. Essentially, his argument is that they should have done more. But, as *Black* and *Loeber* confirm, Limestone's medical staff were allowed to exercise their medical judgment[11] and, in doing so, provide treatments other than antiviral medication for Hepatitis C

---

[11] And, again, this is exactly why Gillentine is not entitled to the appointment of an expert witness in this case. This is not a medical malpractice case. No expert is needed to determine whether medical care was given to Gillentine – it is undisputed that it was. Properly understood, Gillentine's theory is not that he was denied care but

and conform to their constitutional duty under the Eighth Amendment.  *See Black*, 578 F. Appx
at 795-96; *Loeber*, 487 F. Appx. at 549.

Drs. Hood and Truett responded on behalf of all Defendants to Gillentine's allegation that
he was denied adequate medical care while incarcerated.  They reviewed the medical record and
reported on the treatment Gillentine received from 2002 to 2015.  In his complaint, Gillentine
makes no specific allegations against Defendants Dr. Pouparinas, Dr. Joiner, Dr. Barrett, or
Nurse Hunt.   Nevertheless, the court will analyze Plaintiff's allegations against the other
Defendants.

In his complaint, Gillentine's only charge against Dr. Pouparinas is that Dr. Pouparinas
never saw him, never examined him, and never treated him.  (*See* Doc. # 1 at ¶ 46).  Plaintiff
does not claim that he submitted a sick call request to see Dr. Pouparinas and it was denied.  The
fact that Plaintiff was not examined by a particular staff doctor during the fifteen months the
doctor was on staff is simply not evidence that the doctor was deliberately indifferent to
Plaintiff's medical needs.  In January 2009, Plaintiff was assessed by Dr. Joiner, and he was
again assessed in September and October 2010 by Dr. Barrett.  Thus, there is no evidence to
suggest that Dr. Pouparinas was deliberately indifferent to Plaintiff's needs for medical care.

Gillentine asserts in his complaint that Dr. Joiner never examined or treated him.  (Doc. #
1 at ¶ 44).  But Gillentine's own complaint contradicts that generalized statement because he
admits that Dr. Joiner reviewed his blood tests.  (*Id.* at ¶ 47).  And neither Plaintiff nor Gillentine
provided any evidence rebutting Dr. Hood's report that Dr. Joiner examined Gillentine in
January 2009.  Dr. Hood noted that Dr. Joiner found several contra-indications to approving
antiviral treatment for Gillentine.  Again, this involves the exercise of medical judgment, and this

---

that doctors should have exercised their respective medical judgment and provided him different care.  On this
record, an expert is not needed to allow the court to address the merits of that issue.

court cannot second-guess that judgment merely because Gillentine requested and preferred a different form of treatment.  *See Hamm*, 774 F.2d at 1575.  Whether Dr. Joiner was right or wrong about the treatment options available is not the issue; the real question is whether he acted in a deliberately indifferent manner.  He did not.  Likewise, Dr. Barrett's submitted affidavit demonstrated a good faith assessment of the available medical options, none of which were very favorable to Gillentine at the time Dr. Barrett worked at Limestone.  (*See* Doc. # 39-2).

Finally, Plaintiff has provided no evidence that Defendant Hunt was in any position to order antiviral medication for him.  Nurse Hunt was the health services administrator at Limestone and rarely had a role in providing medical care to inmates.  (*See* Doc. # 39-3 at 2).  Nurse Hunt has averred that she had no role in Gillentine's diagnosis or treatment, and Gillentine produced no evidence to contradict that assertion.  (*Id.*).  Plainly, a nurse has no authority to overrule a physician and order treatment which the physician, in his or her medical judgment, thinks is harmful to a patient.  (*See* Doc. # 39-2 at 3 ("It had previously been determined by Dr. Joiner[ ] that Hepatitis C treatment would be detrimental to Mr. Gillentine's health . . . .").  Thus, Defendant Hunt was simply not in a position to provide Plaintiff what he wanted, and she could not have been the cause of any violation of his rights, even if he had received objectively insufficient medical care (which, to be clear, he did not).

For these reasons, all Defendants are entitled to summary judgment on Plaintiff's Section 1983 claims of inadequate medical treatment and deliberate indifference.

### B.    Defendant Corizon is Entitled to Summary Judgment Because Plaintiff Has Not Presented Evidence of a Policy or Custom

In addition to naming various individual Defendants, Gillentine named Corizon, the corporation providing medical services for Alabama prisons, as a Defendant.  (*See* Doc. # 1 at ¶¶ 72-76).  While a corporation providing prison medical services may be liable under Section 1983

if a plaintiff establishes that a constitutional violation resulted from the *corporation's* custom or policy, *see Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997), that is not the case where the Section 1983 claim against the corporation is based merely on *respondeat superior*.  *See Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992); *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978).   Gillentine has claimed that the real reason he was denied antiviral medication was not out of legitimate medical concerns, but financial ones.  (*See* Doc. # 1 at ¶ 49).   But Dr. Hood stated in his affidavit that economic concerns have played no role in the treatment and evaluation of Gillentine, (Doc. # 20-1 at 4), and neither Plaintiff nor Gillentine has offered any evidence beyond speculation to dispute Dr. Hood's statement.   Indeed, this claim is rebutted by the undisputed summary judgment evidence because Gillentine received antiviral medication in 2015.   Moreover, Dr. Hood's statement that economic concerns played no role in deciding whether to authorize antiviral treatment for Gillentine is supported by Gillentine's own report that other inmates at Limestone who have Hepatitis C (and who were determined to be more suitable candidates for the medication) *are* receiving antiviral treatment, despite the alleged financial concerns.  (Doc. # 1 at ¶ 40).  Thus, Plaintiff has not established a policy or custom put in place by Corizon.  *See Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*) (noting that a plaintiff must identify a policy or custom in order to establish a *Monell* claim).   Perhaps more importantly, Corizon is also entitled to summary judgment for Plaintiff's Section 1983 claims on the alternative ground that its policies and customs caused no one to commit a constitutional violation against Gillentine.   *See id.* (holding that a county is only liable for a *Monell* claim where the official policy causes a constitutional violation).

**C.    Defendants are Entitled to Summary Judgment for Plaintiff's Section 1983 Conspiracy Claims Because No Evidence Demonstrates an Agreement Between Them**

Gillentine has claimed that Defendants conspired to deny him adequate medical treatment, but has provided no details of the conspiracy. This claim fails for three reasons. First, as explained above, Gillentine cannot assert a claim for any Eighth Amendment violation against the purported conspirators (even in their individual capacities). Second, conclusory allegations of a conspiracy or formulaic recitations of a conspiracy are insufficient to raise a conspiracy claim. *See Am. Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1293-94 (11th Cir. 2010). Given Gillentine's complete failure to allege facts supporting the existence of a conspiracy or an agreement between the parties, the court could have dismissed his conspiracy claims before the summary judgment stage.[12] And, third, at no point in the proceedings has Gillentine or Plaintiff provided evidence to support the existence of a conspiracy to deprive Gillentine of his Eighth Amendment rights.

On summary judgment, a plaintiff who is attempting to prove a Section 1983 conspiracy must show that the parties "reached an understanding" to deny the plaintiff his or her rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). That is, a plaintiff must show some evidence of an agreement between the defendants. *See Bailey v. Bd. of Cnty. Commissioners of Alachua Cnty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992). Plaintiff has provided no evidence (or factual allegations) demonstrating that these Defendants formed an agreement to deny Gillentine the requested medical care. Indeed, Drs. Joiner and Barrett evaluated Gillentine's

---

[12] To the extent Gillentine claims to be pleading a Section 1985 conspiracy, he has not alleged any racial discrimination or animus, or any violation of his equal protection rights. The absence of an allegation of racial discrimination is fatal to such a claim. *See Park v. City of Atlanta*, 120 F.3d 1157, 1161 (11th Cir. 1997) ("Concerns that § 1985 might be interpreted into a general federal tort law led to the requirement that the conspiracy be motivated by 'some racial, or perhaps other class-based, invidiously discriminatory animus.'" (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)))

individual case and determined that antiviral treatment was inadvisable at that time due to his condition.   Therefore, Defendants are entitled to summary judgment for Plaintiff's conspiracy claims.

### D.    All Requests for Declaratory and Injunctive Relief Are Moot

Gillentine's complaint seeks both declaratory and injunctive relief.  (*See* Doc. # 1 at ¶ 102).  But his death renders the claims for declaratory and injunctive relief moot.  *Thomas v. Bryant*, 614 F.3d 1288, 1294 (11th Cir. 2010) ("Four days before oral argument, in an unfortunate twist of events, plaintiff Thomas died in [Department of Corrections] custody. . . . Both parties agree that Thomas's death renders moot the declaratory and injunctive relief awarded him by the district court.").

### E.    The Court Declines to Exercise Supplemental Jurisdiction

Gillentine's complaint alleges that all Defendants committed negligence under Alabama state law by failing to provide him with adequate medical treatment.  (Doc. # 1 at ¶¶ 76, 81, 86, 91, 96, 101).  The court may decline to exercise supplemental jurisdiction over state-law claims where it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  The court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.  Accordingly, those claims are due to be dismissed, without prejudice, pursuant to Section 1367(c)(3), so that Plaintiff may refile these claims in the appropriate state court.[13]

## VII.   Conclusion

Defendants' motions for summary judgment are due to be granted.  An order consistent with this opinion will be entered.

---

[13]   The court reminds Plaintiff that federal law only tolls the statute of limitations applicable to these state-law claims during the pendency of this action and for 30 days after the dismissal of this action.  28 U.S.C. § 1367(d).

**DONE** and **ORDERED** this December 16, 2016.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE